### J. I. CASE THRESHING MACH. CO. v. BEAVERS et al. (No. 10495.)*

(Court of Civil Appeals of Texas. Fort Worth. Feb. 23, 1924. Rehearing Denied March 29, 1924.)

1. **Principal and agent** ⬅️155(3)—**Order signed by local dealer without buyer's knowledge held not contract between buyer and manufacturer.**

Where local dealer and manufacturer's salesman negotiated with buyer for sale of tractor and plows, and dealer without buyer's knowledge sent order on manufacturer's form in dealer's name, the buyer's contract with the manufacturer was not contained in such order, but was verbal contract entered into with manufacturer's agent.

2. **Principal and agent** ⬅️116(2)—**Buyer held not affected by secret instructions limiting authority of seller's agent.**

Buyer, who had not read private instructions seller had given its salesmen, had a right to rely on salesman's warranties, though contrary to secret instructions from seller, limiting authority of which buyer had no knowledge.

---

⬅️For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

*Writ of error dismissed for want of jurisdiction May 14, 1924.

**3. Principal and agent ⬿116(1)—Rule as to apparent authority stated.**

The principal is bound by the acts and representations of the agent within the apparent scope of his authority, and an innocent third person will not be affected by secret and unknown limitations of the agent's actual authority.

**4. Principal and agent ⬿124(3) — Whether seller's agents had authority to give warranty, held for jury.**

Whether seller's agents had real or apparent authority to warrant tractor and plows *held* for jury.

**5. Principal and agent ⬿169(2)—Seller held to have ratified contract made by its representatives.**

Seller, who with knowledge of contract entered into by its representatives with buyer, retained the purchase price and sent mechanics to remedy defects, ratified such contract.

**6. Sales ⬿442(6, 7) — Buyer of defective farm machinery could recover expenses incurred in effort to make machinery work.**

Where buyer of farm machinery that would not work was induced to keep it because of seller's insistence and purchased parts at seller's request, he could recover the expenses thereof on failure of seller to make the machinery work.

**7. Sales ⬿442(6,7)—Expenses incurred by buyer in trying to make defective machinery work held recoverable, though necessity and reasonableness not alleged.**

In action by buyer of farm machinery to recover purchase price and expenses incurred in effort to make the machinery work, including the compensation paid certain mechanics, in which there was no exception to petition for failure to allege that employment of such mechanics was necessary and reasonable, the buyer could recover the compensation paid mechanics.

Appeal from District Court, Knox County; J. H. Milam, Judge.

Action by G. H. Beavers against the J. I. Case Threshing Machine Company and another. Judgment for plaintiff against named defendant, and named defendant appeals. Affirmed.

Spence, Haven & Smithdeal, of Dallas, for appellant.

D. J. Brookreson and Jas. A. Stephens, both of Benjamin, for appellees.

CONNER, C. J. The facts from which the present controversy arose are as follows: The appellee Beavers was a resident of Knox county, Tex., and owned a farm and ranch in that county. W. F. Snody was the local dealer and J. F. Preston was a traveling salesman for the appellant threshing machine company. In the month of July, 1919. Beavers became interested in buying a tractor and plows. The appellant machine company was engaged in the business of manufacturing and selling such plows, having a general agency for the state of Texas at Dallas, with local dealers and traveling salesmen. Snody, appellant's local dealer in Knox county, knowing of Beavers' interest in the subject, called upon said Preston to aid him in making a sale of a tractor and plows manufactured by the appellant machine company to Beavers. Without reciting the circumstances of the various meetings that thereafter occurred between the parties, and after Beavers had fully explained the uses to which he desired to put such tractor and plows, and after assurances given by Preston and Snody that the one they proposed to sell to him would answer such purposes, Beavers purchased what is termed a Case tractor and plows, for the agreed sum of $1,771.60. The tractor and plows were shipped out from Dallas to Knox county with draft attached to the bill of lading, which was paid by Beavers, together with the further sum of $208.60 freight charges. The tractor and plows were delivered upon the farm of Beavers by Preston and Snody, but the evidence warrants the conclusions that the tractor was defective and would not perform and could not be made to perform the services for which it was manufactured and purchased by Beavers, and this suit was instituted by Beavers against the appellant machine company and W. F. Snody to recover the sum paid by him as the original purchase price plus the freight charges paid by him, and various sums expended by him in the effort to so repair the machinery as to answer the purposes for which he had purchased it.

The defendant machine company pleaded, among other things, a general denial, and specially that it had sold the tractor and plows in controversy to the defendant Snody upon a written contract containing conditions and warranties that had not been complied with; that Snody was its dealer in Knox county under a written agreement authorizing him only to solicit orders upon a commission; that Preston was its traveling salesman, but that neither Snody nor Preston had authority to make representations or contracts for the company, and were especially without authority to make the sale to Beavers except upon a written order in a form prescribed by the company to be duly accepted by it; that it would not have sold the tractor and plows in question to Beavers without such written order therefor and at the price of $1,771.60, which was its list price to purchasers, less the commissions allowed its dealer Snody under the terms of his written agreement of appointment.

The defendant Snody was discharged by a peremptory instruction of the court, and the case was submitted to a jury upon special

⬿For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

issues, which, together with the answers thereto, are as follows:

"(1) Did the defendant J. I. Case Threshing Machine Company sell the tractor and plows in controversy to the plaintiff, G. H. Beavers, by and through its representatives J. F. Preston and W F. Snody, or were the plows and tractor in controversy bought by F. W. Snody from the defendant J. I. Case Threshing Machine Company, and then sold by .W. F. Snody to the plaintiff Beavers? Ans. Yes; defendant sold to G. H. Beavers through its representatives, J. F. Preston and W. F. Snody.

"(2) If you should answer special issue No. 1 that the sale of the tractor and plows made by J. I. Case Threshing Machine Company by and through its representatives Snody and Preston, to G. H. Beavers, the plaintiff herein, then did the said Snody and Preston, in making such sale to the plaintiff, represent that said tractor and plows would do good and economical plowing? Ans. Yes.

"(3) Was the plaintiff, G. H. Beavers, induced to purchase said tractor and plows, if you find he did purchase said tractor and plows from the defendant J. I. Case Threshing Machine Company, relying upon representations made by the said W. F. Snody and J. F. Preston? Ans. Yes.

"(4) If you should find that the defendant J. I. Case Threshing Machine Company sold to plaintiff Beavers by and through its representatives, the said Snody and Preston, the tractor and plows in controversy, and should further find that said representatives, in making the sale, made representations to plaintiff that the tractor and plows would do good, economical plowing, and that plaintiff relied upon said representations in purchasing said tractor and plows, then was the tractor and plows delivered to plaintiff in condition to do good and economical plowing? Ans. No.

"(5) If you should find that the tractor and plows delivered to the plaintiff were not as represented by the defendant, through its representatives, Snody and Preston, then what was the actual cash market value .of the tractor and plows delivered to plaintiff? Ans. $850.

"(6) Were the sums of money expended by the plaintiff a necessary and reasonable expense in determining whether or not said tractor and plows were as represented? Ans. Yes."

Upon this verdict the court gave judgment for $1,129.86, being the difference between the $1,771.60, plus $208.26 freight charges paid by Beavers on said machinery, with interest on such difference to the date of the trial, plus $292 found to be necessary and reasonable expenditures, with interest thereon, aggregating in all $1,647.76, from which judgment this appeal has been prosecuted.

In addition to what has been said, it is shown by the testimony in behalf of appellant without dispute that it executed what is designated as a dealer's commission agreement, under the terms of which Snody was acting as appellant's dealer in Knox county. The instrument consists of some page and a half of legal size paper, closely spaced and finely printed, containing numerous provisions guarding the interests of the appellant company, and which Snody, in testifying, stated that he did not remember to have read except those paragraphs relating to his commission. Snody therein agreed, however—

"To diligently canvass for purchasers and in all reasonable and proper ways to promote the trade and interests of the Case Company, * * * not to interfere with or attempt to control the trade of persons seeking to purchase through or negotiate with any other dealer authorized by the Case Company.

"To deliver no machinery in any case, except upon the written order of the purchasers, taken upon the Case Company's forms, in duplicate, first duly accepted by the Case Company at its home office at Racine, and for cash in hand, or interest-bearing notes actually received, duly executed, and properly secured, and conditioned according to the terms of sale herein specified, and exactly according to the terms and conditions of the order as accepted by the Case Company, with actual cost of freight added. Any delivery of machinery in violation of these, or any of these requirements, or the making or permitting of any test or demonstration before acceptance of and settlement for any machinery ordered shall be deemed a conversion of the goods by the dealer, who shall thereupon become personally liable for, and on demand shall account to the Case Company in cash for the full list price thereon, with interest from date of delivery at the highest rate allowed by law on written contracts, and shall waive all claims under the warranty, and protect the Case Company from all such claims on any machinery sold or delivered in violation hereof; and, until the same be so accounted for, all notes or securities taken thereon shall belong to the Case Company. In case the dealer shall deliver any machinery in violation of this agreement, the Case Company may, in its discretion, deal directly with the purchaser and make such settlement with him as the Case Company shall deem best without prejudice to its claim against the dealer for the full list price of said machinery and for all loss and expenses sustained by the Case Company by reason of such violation. * * *

"To take a written order for all machinery, whether for cash or notes, upon the Case Company's 1919 order blank, in duplicate, containing the property statements of the purchasers properly filled and signed, and verified by the dealer. All orders are to be signed by the purchaser and by the dealer, recommending the same, one of which shall be delivered to the purchaser, and shall contain the Case Company's standard form of warranty without alteration, and the other of which shall be promptly mailed to the Case Company, for its acceptance; but such acceptance, or the approval of any branch manager, officer, or salesman of the Case Company, shall not be deemed a waiver of any breach of duty, or of any stipulations of this agreement, unless expressly so agreed by the Case Company in writing.

"To remit to the Case Company the cash for extras, supplies, and repairs sold, including all charges for forwarding such extras, supplies, and repairs, as often as called on to do so. No balance due for extras, supplies, and repairs shall be offset by the dealer by any claims for .

commissions or balance on sales. The dealer shall sell extras, supplies, and repairs strictly at list price. Where extras, supplies, and repairs are ordered for customers, requiring service of telegraph, telephone, express, freight, or parcel post, such expenses may be added to the list prices, and must be paid by parties ordering. The dealer shall become personally responsible to the Case Company for all loss or expense incurred on account of mistakes in telephone orders. * * *

"To deliver or ship all goods belonging to said Case Company at any time upon their order, and when reshipped only the freight paid by the dealer thereon shall be collected as charges. To pay freight or express charges on repairs returned or to be returned to the Case Company."

The agreement contains a number of other provisions of like character and specially the amount of commissions to which the dealer is entitled, and further specifies that—

"No commission is earned or payable where from any cause goods shall be returned by the purchaser or where goods or other property shall be taken by the Case Company in settlement or compromise of any note or notes or part thereof given therefor, or otherwise, or shall be bid by the Case Company, at a sale on execution, attachment, or foreclosure. * * * That the Case Company shall not be responsible for or bound by any acts of the employees, canvassers, or other persons in any capacity, in the service of the said dealer, and such employees shall in no sense be deemed employees or agents of the Case Company, and for any default or misconduct of such, the said dealer shall be responsible. The Case Company's branch managers, salesmen, canvassers or experts who assist the dealer in soliciting sales, exhibiting samples, or on other work, do so as his employees for the time they are so working."

The agreement contains other provisions not thought necessary to set out, but which, when considered together with the whole, suggests that the appellant company thereby attempted to protect itself from loss or damage arising from all contingencies that might reasonably be supposed.

Appellant also offered the oral testimony of witnesses to the effect that J. F. Preston was its traveling salesman, without authority, however, to execute any contract in behalf of the company, his duties being to designate dealers, forward agreements with them for approval, and to solicit orders for machinery upon the printed forms of the company containing its restricted warranties, etc., which orders were subject to the approval of the company.

Upon the foregoing testimony, as near as we can briefly state it in substance, appellant predicates what appears to be its principal contention in this court, to wit: that the sale of the machinery in question to appellee Snody and Preston was not that of the appellant company, but is to be considered as the contract of Snody alone, and that hence no privity of contract between appellant and appellee Beavers existed and that none of its warranties as stipulated in the form order required of purchasers was shown to have been authorized or violated.

[1] It was shown, however, without dispute, that the appellee, Beavers, never saw or read either the agreement of Snody with the company or the form provided for the signature of purchasers. Appellee, Snody, and Preston all practically agreed that the negotiations were substantially as follows: Snody, learning of appellee's desire for a tractor and plows, called upon Preston and the two then negotiated with appellee with the result that appellee finally agreed to take the tractor and plows for the agreed sum before stated, to wit, $1,771.60; that appellee knew at the time that the company would not sell to him the tractor and plows at that price, but Snody, being anxious for the introduction of the plows in that country, agreed to remit his commissions, which, when done, left the price appellee agreed to pay. By arrangement and agreement between Preston and Snody, however, Snody made application for the machinery upon the written form of the company, stating the terms as cash and the price as $1,771.60, he, as dealer, being entitled under his commission agreement to have the machinery shipped to him at that price. Upon the application so prepared, Preston indorsed the words, "This party is our agent." The order as so prepared was sent and accepted by appellant's branch office in Dallas, which caused the machinery to be shipped to Snody with draft for the price stated attached to the bill of lading, and the machinery was received and delivered on the farm of appellee. Appellee, however, knew nothing of the fact that application had been made in the name of Snody upon the company's form. This fact was concealed from appellee according to Snody's testimony, for the reason that he feared that appellee Beavers might hesitate to sign the application, further testifying that Preston wrote the order, he (Snody) explaining at the time that he did not have any money with which to purchase the machinery and did not want to become responsible therefor, and that he wanted the order so written as to protect him in these respects, and that to that end Preston indorsed on the order "This party is our agent," making the statement that that would be sufficient.

We find no merit in the principal contention stated. Appellee did not execute the order accepted by appellant at its branch office in Dallas, knew nothing of its terms, and did not sue for the breach of any warranty contained in the order, and the contract upon which appellant is liable, if at all, is not in writing, but one verbally made with the company's representative. And the material questions before us, we think, are

whether the verbal contract was within the scope of the authority, or apparent authority, of Snody and Preston, and, if not, whether, as we shall hereinafter discuss, the contract as actually made by these representatives was ratified by the company. We will therefore now address ourselves to these questions.

The testimony as a whole has been carefully considered, and there is at least room for the contention that the sale made by Preston and Snody was in fact authorized. It is true appellee testified that he knew the company would not sell to him direct for the price stated, or to customers generally except upon written order, but the order in many of its provisions contemplated. sales upon credit or part cash and part credit. In case of a sale for cash, Snody was apparently authorized to deduct his commission and forward to the company its net price, as was actually done in the case before us, and Preston testified that he had never known the company to refuse to ship machinery when the cash was received.

Abstractly, it may be true, as contended in behalf of appellant, that the company had the right to select its customers and fix its price, but there was no attempt to show that appellee for any reason was an unacceptable purchaser, and it is undisputed that appellant received in the transaction the exact amount of money that it would have actually received had appellee been the one who in fact signed the written application; no tenable reason is assigned why the company would have refused to ship the written order, paying for the machinery the price he did, accompanied by a formal waiver of commissions on the part of its dealer Snody. We recall no provision of the agreement with Snody, nor any evidence to the effect that Snody was not allowed the privilege of remitting commissions as a means of introducing appellant's machinery and supplies in the section where he lived. And it may therefore be well said, we think, that the departures of appellant's acknowledged agents in in the instance before us in the performance of their duties as prescribed by appellant were wholly immaterial and worked no injury, of which appellant can reasonably complain. Not only were those agents acting within the purview of the general purpose of their appointment, but also in the interest of the company. It is not even contended that the judgment in this case rests upon any warranty not comprehended within the warranties specified in its printed applications designed for execution by purchasers. As printed, the appellant company warranted machinery sold to its purchasers on application (with exception not necessary to notice) "to be made of good material, and durable with good care, and to be capable of doing as much and as good work as other machines made of equal size and proportions,

working under the same conditions on the same jobs, if properly operated by competent persons, and the printed rules and directions. of the manufacturers intelligently followed." The law implies as much. To illustrate, it is said in Williston on Contracts, vol. 2, § 986, that:

"Where the seller manufactured the goods which he sold, a warranty that the goods are merchantable is implied both in England and in America, unless something in the terms of the bargain indicates a contrary intention, or unless the buyer had opportunity to inspect the goods and this inspection would have disclosed, the defect."

In section 989 of the same work, it is. said:

"The warrant of merchantability is not the only warranty that may be implied on the sale of goods. Where the buyer buys goods for a particular purpose, a warranty is sometimes implied that the goods shall be fit for that purpose. * * * The principle already laid down that a manufacturer impliedly warrants his goods to be merchantable includes, therefore, a doctrine sometimes stated in this way—that the manufacturer of goods impliedly warrants. that they are reasonably fit for the general purpose for which they are manufactured."

See, also, Giles v. San Antonio Foundry Co. (Tex. Civ. App.) 42 S. W. 1020; Houston Cotton Oil Co. v. Trammell (Tex. Civ. App.) 72 S. W. 244; Houk v. Berg (Tex. Civ. App.) 105 S. W. 1176.

Numerous other authorities both in this and in other states might be cited of like effect, and the warranty to be so applied in this case is no greater or no less than would have been had appellee in fact been required to follow the usual course by signing the printed application for his machinery. That the machinery purchased by appellee was not in fact as warranted in the representations of the agents who sold, in the written warranty accorded purchasers by appellant, or as implied by law, was asserted in the pleadings, sufficiently established by the evidence, and further by the jury. So that, as already indicated, the variations by appellant's acknowledged agents from the undisclosed limitations of their authority seem wholly immaterial in this case. We therefore are not inclined to give much force to appellant's vigorous contention that the sale in question by appellant's agents was unauthorized.

[2] For the purpose, however, of final disposition, it may be assumed that neither Snody nor Preston were authorized to make the sale they in fact did make. It yet does not follow by any means that appellant was not responsible for the damages appellee sought to recover. It is undisputed that appellee neither saw nor read the private instructions given by appellant to its representatives, and knew of no limitations of authority other than already stated. And the principle we have in mind is that, when a

general agent is appointed, persons dealing with him in relation to the business of his principle are not affected by any secret instructions limiting his authority which had not come to their knowledge. See Railway Co. v. Hill, 63 Tex. 381, 51 Am. Rep. 642. )

In Williston on Contracts, vol. 1, § 277, it is said, in part, that:

"An agent may be able to make contracts which will bind his principal, not only when actually authorized by express words or implication of fact to do so, but also in cases where the principal did not intend to confer such authority on the agent but, nevertheless, held out to the public or to the person with whom the agent dealt an appearance of authority. If one with whom the agent dealt justifiably believed the agent was authorized, and if the facts justifying that belief were due to the conduct of the supposed principal, the latter will be bound. The misconduct on the part of the supposed principal need not have been fraudulent or willful."

We find this statement on page 856, § 34, of 21 R. C. L.:

"Whenever a principal has placed an agent in such a situation that a person of ordinary prudence, conversant with business usages, and the nature of the particular business, is justified in assuming that such agent is authorized to perform in behalf of his principal the particular act, and such particular act has been performed, the principal is estorped from denying the agent's authority to perform it."

[3] In support of the statement quoted, the author cites numerous cases in a note to the text. We will not stop to cite other authorities, assuming that the general principal is well recognized that the principal will be bound by the acts and representations of the agent within the apparent scope of his authority, and that an innocent third person will not be affected by secret and unknown limitations of the agent's actual authority.

In the case before us it is undoubtedly true that both Snody and Preston were agents of appellant company, their appearance upon the scene was certainly authorized, and it cannot be pretended that Snody was in the attitude in his relation to the company of a purchaser. The evident purpose of his appointment to ordinary apprehension was that of a sales agent, as was likewise true of its agent Preston. The evidence is to the effect that the two solicited appellee, not merely to apply for, but to purchase the machinery in question. As inducements to that end, the evidence was that Preston and Snody took appellee to an adjoining county to witness the operation of the tractor of the kind actually at work. Appellee was satisfied therewith, came back and negotiations were concluded.

Snody testified on cross-examination:

"I am acquainted with J. F. Preston and knew him in September of 1919. I had then been acquainted with him for several years. He was the representative at that time of the J. I. Case Threshing Machine Company in this community, representing it in sales matters relative to engines, tractors, and threshers. He has been such a representative for several years. I made the trip with Dr. Beavers to Foard county, about which I have heretofore testified, at the instance of Mr. Preston, going in his car and reporting to him on my return. The sale of the tractor to Beavers was made after my return therefrom. * * * I do not know that I knew that J. F. Preston was nothing but a traveling salesman for the Case Company. I knew he was working for them. I have seen him solicit orders to be sent in to the Dallas office, and I have seen him collect money occasionally. That is all I ever saw him do. * * * I knew they would not accept Dr. Beavers' order at that price, and I knew that at that time. I would not say that I knew that the Case Company would not sell at all except upon a written contract. I thought that they sold all machinery upon a written contract. * * *

"If I could introduce the tractor in this country and get Dr. Beavers to make a success of it, it was my idea that I could sell more tractors in this country, and in that way I would get a commission off of them. The suggestion that I waive my commission, that is, turn the tractor over to Dr. Beavers at the same price I paid the Case Company was done voluntarily on my part to induce Dr. Beavers to take the tractor. I think it is true that the Case Company got exactly the same price in its sale to me as it would have if I had sold the tractor to Dr. Beavers at the list price. I think that is right. * * * At the time this sale was made I called Mr. Preston more than once. I talked to him the day before at Crowell. I told him that if he would come down here I thought we could sell Dr. Beavers the tractor. He came, and the next day we sold Dr. Beavers the tractor. * * * The sale was made by me and Preston to Dr. Beavers. We were selling the tractor to Dr. Beavers, and at that time Mr. Preston knew that I was not buying that tractor as a dealer."

Appellee testified:

"I had all negotiations in conversation with reference to the purchase of this tractor and plows with Mr. Preston and Mr. Snody. I bought the machinery I thought from Snody and Preston. In fact, Mr. Preston was the man I thought I was dealing with through Mr. Snody. Mr. Preston sold the machinery to me, representing himself to be the agent of the J. I. Case Threshing Machine Company. * * * I knew that Preston told me that he was a traveling salesman for the Case Company, and he said that he sold those engines whenever he got a chance. I never wrote to the home office of the Case Company to find out the authority of either of these men."

Among other things, Mr. Preston testified:

"When I got here Walter (Snody) and I had a talk about the situation, and he said he believed the doctor was going to buy. He said he had agreed to give Dr. Beavers his commission in it in order to get the tractor here and demonstrate and show what it would do. We talked about that part of it, whether it would be practical or not, and it was agreed

that he would' do that. * * * I told Dr. Beavers that I would sell him the Case tractor with the assistance of Mr. Snody. When I talked to him the last time he said he would take it. Snody said it was not necessary, and we had better not try to get the doctor to sign an order, as he might kick back. We did not ask him."

[4] We think the issue of authority, real or apparent, on the part of appellant's representatives, was fairly comprehended within the first issue submitted by the court to the jury. It was the jury's function to determine that issue. The answer of the jury was in favor of appellee, and we feel unable to say that, under all of the circumstances as developed by the evidence, construed most favorably in behalf of appellee, that the jury's verdict on this issue is not sufficiently supported.

[5] There is yet another reason why we are disinclined to materially disturb the judgment in appellee's favor, for the evidence, to which we shall now refer, tends to show a ratification of the contract, as also perhaps to strengthen the conclusion that Preston and Snody were not without authority in making the sale in question. We will not quote the evidence on this phase of the case, but it shows substantially, without question, that, upon the arrival of the tractor and plows at their destination from Dallas, the shipping point, the appellee was absent, and in answer to a telegram from Snody authorized the local bank to pay the draft attached to the bill of lading, whereupon Snody and Preston received the tractor and plows, and, together, after some difficulty, delivered the same upon the premises of appellee. It was, then found that the tractor had a bent axle and perhaps some defect of adjustment in the engine. It was nevertheless delivered, and upon appellee's return an attempt was made to use the tractor, which failed to operate satisfactorily. Upon complaint to Snody, first some local mechanic attempted to remedy it, but, according to the evidence in behalf of appellee, the tractor and plows continued to fail, whereupon the appellant company from its Dallas office sent one mechanic and later another on two different occasions, but without so remedying its defects as to make it fulfill the purpose for which it had been purchased by appellee or the warranties which the law in such cases imply. Appellee Snody testified that within a short time after the sale in question he was in Dallas and informed appellant's assistant manager at that place "just how the trade with Beavers was handled."

It is not contended that appellant's managers at its branch office in Dallas were not its general agents, or without authority to bind it in contracts of the kind. In other words, said agents at Dallas, we think, are to be considered as the alter ego of the appellant company, and such agents, having

cause the shipping of the machinery, and having received the purchase price in cash, and having soon thereafter obtained knowledge of just how the trade with Beavers was handled, and thereafter having in a sense, at least, apparently recognized the validity of the contract of sale and its duty as far as possible to render its machinery merchantable, in legal effect ratified the contract made by Preston and Beavers, particularly in view of the further fact that it yet retains the moneys—the fruits—arising from the contract, and yet retains, for aught the evidence shows, in its employ without reprimand, both Snody and Preston.

In 21 R. C. L. p. 919, § 99, it is said:

"It is a well-established rule of law that if one, not assuming to act for himself, does an act for or in the name of another upon an assumption of authority to act as the agent of the latter, even though without any precedent authority whatever, if the person in whose name the act was performed subsequently ratifies or adopts what has been so done, the ratification relates back and supplies original authority to do the act. In such a case the principal is bound to the same extent as if the act had been done in the first instance by his previous authority; and this is true whether the act be detrimental to the principal or to his advantage, or whether it sound in contract or tort." ·

In Williston on Contracts, vol. 1, p. 531, § 278, it is said, among other things, that:

"Subsequent ratification by a principal of a contract made on his behalf by one who had at the time neither actual nor apparent authority, is as effectual as original authorization. * * * Ratification like original authority need not be express. Any conduct which indicates assent to the transaction is sufficient. Even silence with full knowledge of the facts may operate as a ratification. The person with whom the agent dealt will so obviously be deceived by assuming the professed agent was authorized to act as such, that the principal is under a duty to undeceive him."

On the whole, therefore, we conclude that the judgment below cannot be materially disturbed because of any of the errors assigned.

[6] Appellant, however, makes some complaint relating to the items of expense included within appellee's demand. These items aggregated $292, and were alleged to have been expended by appellee in his efforts to make the machinery operate, and the jury found they were necessary and reasonable. It is objected that, appellant "not having agreed to repay the amounts paid by plaintiff to mechanics employed on his own initiative in an effort to remedy the defects in the tractor, the sums thus expended by him without the authorization of the defendant Case Company cannot be recovered by him of said company and formed no proper measure of damages in this case." The proposition so stated was presented by an exception to the plaintiff's petition, which was

overruled, and of which ruling complaint is made. The exception thus reads:

"This defendant excepts to the items of damage alleged in paragraphs 12, 13, and 14 of plaintiff's said pleading, for the reason that same are not recoverable in law and are indefinite, vague, and general, and entitle plaintiff to no recovery therefor."

We think the exception was properly overruled. In 13 Cyc. p. 61, par. 4, it is said:

"As a general rule a party is entitled to all legitimate expenses that may be shown to flow from or follow the breach of a legitimate contract, provided it appears that such expenses were the natural consequences of the breach, and are reasonable, having regard to all the circumstances of the particular case."

The rule so stated is supported by the great weight of authority, and the plaintiff alleged that the machinery would not work and that he was induced to keep it because of the insistence of defendant and that he purchased parts at the request of defendant, and there is no sustainable attack upon the verdict of the jury to the effect that the items of expense included within the aggregate stated were not reasonable and necessary, nor do we find that there was any objection to the evidence supporting these items of expense (except as to one item to be hereinafter noted) on the ground that it was not alleged or shown that the expenses were necessary and reasonable. Moreover, the propositions presenting the questions, except one, seem based upon the alleged action of the court in overruling appellant's special exceptions 8 and 9 to the plaintiff's original petition, and we find no judgment of the court acting upon these exceptions. Of the $292 aggregate mentioned, $127 was for machinery parts alleged to have been purchased upon the insistence of Snody in order to remedy the defects in the machinery. It was alleged that for these items the appellant company was paid in cash the sum of $127. It is fair to presume, therefore, that they were reasonably worth the sums appellant charged therefor, and appellant's agent would not have insisted upon their purchase unless it was reasonably thought necessary to do so.

The remaining items of the said $292 aggregate consisted of $100 paid by appellee to a mechanic Patterson, and $65 paid to one Ramsey, covering expenses of a trip to Dallas in order to purchase parts. It was alleged that Patterson was a skilled mechanic and his services were secured at the instance of Snody, appellant's dealer, in the effort to make the machinery operate. The objection to the testimony of appellee in relation to his employment and payment of Patterson was that:

"It was incompetent, irrelevant, and immaterial, in that it states no proper measure of damages against the J. I. Case Threshing Machine Company, for that defendant is not legally bound to repay to the plaintiff amounts paid out by him to mechanics hired by him upon the order of the defendant Snody."

It does appear in a bill of exception taken to Patterson's testimony as to the amount paid him by Beavers that, in addition to the objection last above quoted, it was also objected that no proper predicate had been laid, "in that it was not shown that this was a reasonable charge for the services rendered by the mechanic." If it be admitted that the latter objection to Patterson's testimony should have been sustained, we think the error in overruling the objection not sufficient to cause a reversal or an elimination of the item, for the reason that appellee Beavers' testimony as to the amount paid Patterson was substantnally the same as Patterson's testimony on the same subject, and, as shown, no objection to appellee's testimony, as last noted, was made.

The objection, as shown by the bill of exceptions to appellee's testimony, to the effect that he had paid Ramsey $65 for making the trip to Dallas, was—

"on the ground that the question and any answer to be elicited thereby was irrelevant and immaterial, as stating no proper measure of damage in the case, in that the J. I. Case Threshing Machine Company was not bound or obligated to repay Dr. Beavers amounts of money which he paid his agents for going to Dallas to get parts for him, and that same constituted no proper measure of damages in the case, which objection having been considered was overruled," etc.

[7] We find no specific allegation in plaintiff's petition that the employment and payment of mechanics Ramsey and Patterson was necessary and reasonable, but, as shown, there was no exception to the petition on this ground. The services were procured at the order of appellant's agent. The testimony was not objected to. (except as above noted), on the ground that such services were not necessary and reasonable. The $65 paid to Ramsey was for transportation and hotel charges only, which, if the trip was necessary at all, were presumably necessary and as reasonable as such charges usually are. While allegations of necessity and reasonableness as to such items are ordinarily necessary, yet we conclude that as presented to the trial court and to us the particular objections urged are shown to have been waived or not well taken. The nature of the services and items as explained in the evidence are such as are legally chargeable to appellant and to at least raise the presumption that the parts purchased and the sums paid to Patterson and Ramsey were reasonably necessary and support the verdict of the jury to that effect. All propositions relating to this subject are accordingly overruled.

We find nothing of sufficient importance to require further discussion, and according-

ly overrule all of appellant's propositions of error and affirm the judgment.

## On Motion for Rehearing.

Appellants present an extended motion for rehearing, agreeably couched in respectful but forceful terms, urging numerous errors in the conclusions expressed in our original opinion. In view of which we have again reviewed the record, and, while we do not know that we can add materially to what we originally announced, we will briefly notice a few of the contentions presented in the motion which are apparently particularly stressed. We think the facts deducible from the evidence, as stated in our original opinion, are substantially accurate, and that the omissions noted and which council desire added, are evidentiary in character and immaterial to the conclusions reached.

Counsel also request that we state if by our decisions we intend to depart from the holding in Baker v. Kellett-Chatham Machinery Company (Tex. Civ. App.) 84 S. W. 661, "that a traveling salesman has no apparent authority to make a binding contract for his principle." As applied to the particular facts of that case, we have no complaint to make of the announcement therein made, but we thought and yet think that the case is clearly distinguishable from the one before us. In that case, Baker & Co. instituted suit for damages to recover for the breach of an alleged contract of the Kellett-Chatham Machine Company. The court found that the contract had been executed to furnish certain irrigation machinery by one McCutcheon; that he only had authority to solicit orders for its purchase, which were to be submitted to defendants for its ratification and approval; that the price fixed by other parties in competitive bids for the same machinery was so far in excess of the price fixed by McCutcheon on the defendant's machinery that it would ordinarily excite suspicion, either that the party, offering for sale such machinery at the low price charged by McCutcheon, was suffering from some mental aberration, or had no authority from his principle to sell at such figures, and "fixed upon the purchaser notice that the agent had exceeded his authority"; that, immediately upon the receipt of the order, the machinery company repudiated it and received nothing thereunder, Baker & Co. not having paid anything upon the contract. The court further held that the testimony was such as to support the conclusion "that plaintiffs knew, or by the exercise of ordinary prudence could have known the limitations upon McCutcheon's power as defendant's agent, and that the contract they undertook to make with him exceeded his authority, and would have no binding effect upon defendant in the absence of its approval or ratification;" and that, by the exercise of such reasonable care as a person of ordinary pru-

dence would use under the same circumstances, the plaintiffs would have known that approval of such contracts was required in order to consummate the sale.

The case of Short v. Metz Company, by the Court of Appeals of Kentucky, reported in 165 Ky. 319, 176 S. W. 1144, is also emphasized in the motion. In that case it appears that the Metz Company was engaged at Waltham, Mass., in the manufacturing and sale of automobiles, which were known as the Metz. Short, at the time, was the owner of a Reo five-passenger auto, and he and one Humphreys entered into a contract by virtue of which Short was to swap his Reo car to Humphreys for one of the Metz cars, Short to give Humphreys $175 as boot between the cars. We need not, we think, trace the circumstances ending in the Metz Company refusing to deliver the car to Short, inasmuch as it was distinctly held that at the time of making this contract Humphreys was not an agent of the Metz Company of any kind; the court stating that—

"The evidence not only fails to show that at the time of the making of the contract between Humphreys and appellant Humphreys had any authority to make a contract for appellee, but conclusively shows his want of such authority."

It further appeared in the case that pursuant to the contract, Short paid to Humphreys $175, of which Humphreys sent $150 to the Metz Company upon their refusal to ship without such advance payment, and the receipt of this money was pleaded as ratification of the contract with Humphreys. But the court found that the order for the car was by Humphreys alone, that they knew nothing of Short in the transaction till long afterwards; that the shipment of the car was to Humphreys with the draft attached to the bill of lading which Humphreys failed to pay; that the sale in fact was to Humphreys, and they had the right to retain the amount received by it thereon; and that the retention of the money would not amount to ratification.

We submit that those cases are not controlling here. The sale in question was made by acknowledged agents of appellant, under circumstances briefly stated in our original opinion. Upon the delivery of the machine, the purchase price was forthwith forwarded to appellant's general agents at Dallas, Tex., and soon thereafter, according to the testimony of the dealer Knox, full explanation of the circumstances of the sale was made to the Dallas representatives. This must have been before the receipt by the company at its main office at Racine, Wis., of the order or money paid for the machine, for we find indorsed upon the order the following: "Order received at office in Racine, Nov. 29, 1919. Accepted 11–29–19," and the evidence shows that that order was sent to the Dallas office on September 6, 1919, that the tractor arrived

for delivery September 19, about twenty days after the order had been sent in. Mr. Knox testified that he went to Dallas and made the explanations to which we have referred, just after Mr. Beavers returned, which was about October 1, 1919. So that we have a case in which the appellant company, with full knowledge that must be imputed to it of the manner and circumstances of the sale made by its agents, not only retained the fruits of the sale, but also further recognized it as operative by making no complaint and sending its mechanics and operatives from its Dallas headquarters to remedy the defects in the machinery. The evidence all seems to indicate to us that both Knox and Preston and appellant's agents at Dallas were acting in good faith in furtherance of the interest of their principal, to the end that their manufactured articles should be introduced and sold in the market of that section.

Other features of the motion for rehearing perhaps merit notice, but the writer's other duties seem to preclude further discussion.

The motion for rehearing is accordingly overruled.